Filed 12/30/14  P. v. Fallon CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B251619 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA056500) |
| v. | |
| JAMES S. FALLON and CHARLES E. THOMPSON, | |
| Defendants and Appellants. | |
| In re | B259093 (Los Angeles County |
| JAMES S. FALLON, | Super. Ct. No. MA056500) |
| Petitioner, | |
| on | |
| Habeas Corpus. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Charles (Carlos) A. Chung, Judge.  Reversed and remanded.

ORIGINAL PROCEEDINGS in mandate.  Charles (Carlos) A. Chung, Judge. Petition for writ of habeas corpus is denied as moot.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant, Charles E. Thompson.

James Koester, under appointment by the Court of Appeal, for Defendant and Appellant, James Fallon.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jonathan J. Kline and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendants and appellants James Fallon and Charles Thompson appeal from the judgments after a jury trial in which they were each convicted of attempted murder (Pen. Code, §§ 664, 187, subd. (a)), two counts of criminal threats (Pen. Code, § 422), two counts of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), one count of assault with a firearm (Pen. Code, § 245, subd. (a)(2)), and one count of burglary (Pen. Code, § 459), and in which defendant Thompson was also convicted of vandalism (Pen. Code, § 594).  Defendants contend:  (1) the trial court erred in failing to instruct the jury on the issue of reasonable doubt; (2) other instructional error; (3) the jury was inadvertently exposed to a highly prejudicial document which was mistakenly attached to an exhibit; (4) the evidence was insufficient to support several of their convictions; and (5) the prosecutor committed misconduct in argument to the jury.  Defendant Fallon has also filed a petition for writ of habeas corpus asserting (6) ineffective assistance of counsel.  We conclude that the failure to instruct on reasonable doubt and the jury's inadvertent exposure to the prejudicial document each constitute reversible error, entitling defendants to a new trial.  We further conclude that insufficient evidence supports defendants' convictions for one count of criminal threats and defendant Thompson's conviction of burglary, but reject defendants' other challenges to the sufficiency of the evidence.  As the matter must be retried, the defendants' remaining contentions are moot.

### PROCEDURAL BACKGROUND

Defendants were charged by information with nine counts, arising from two separate incidents, an attack on victim Edward Donato and an incident in which they threatened victims Alonzo Payton and Eric Fuggins.  With respect to the attack on Donato, both defendants were charged with attempted murder, burglary, and assault with a firearm.  With respect to the attempted murder, it was further alleged that the attempted murder was committed with premeditation and deliberation, both defendants personally inflicted great bodily injury on the victim (Pen. Code, § 12022.7, subd. (a)), and defendant Fallon personally used a firearm (Pen. Code, §§ 12022.5, 12022.53, subd. (b)).  With respect to the burglary, it was further alleged that another person, not

3

an accomplice, was present (Pen. Code, § 667.5, subd. (c)(21)), a principal was armed (Pen. Code, § 12022, subd. (a)(1)), and that defendant Fallon personally used a firearm (Pen. Code, § 12022.5). With respect to the assault with a firearm, it was further alleged that defendant Fallon personally used a firearm (Pen. Code, § 12022.5). During trial, the information was amended to include the allegation that, with respect to the assault with a firearm on Donato, both defendants personally inflicted great bodily injury.

With respect to the incident involving victims Payton and Fuggins, both defendants were charged with criminal threats and assault with a deadly weapon on each victim. It was further alleged that each offense was a hate crime committed in concert (Pen. Code, § 422.75, subd. (b)).

It was further alleged that defendant Fallon had suffered three prior serious or violent felony convictions within the meaning of Penal Code section 1170.12 ("strikes"), three prior serious felony convictions within the meaning of Penal Code section 667, subdivision (a), and two prior prison terms within the meaning of Penal Code section 667.5, subdivision (b). It was alleged that defendant Thompson had suffered one prior strike and one prior serious felony conviction.

The information initially included charges against a co-defendant, Charles Marvin. As we shall discuss, it appears that Marvin entered into a negotiated disposition with the prosecution. He was not present at defendants' trial.

Both defendants pleaded not guilty and the case proceeded to a jury trial. While the jury was deliberating, the defendants waived their right to a jury trial on the prior conviction and prior prison term allegations, and admitted them. The jury found defendants guilty as charged; all enhancement allegations were found to be true.

Defendant Fallon was sentenced to a term of 48 years to life in prison for the attempted murder, calculated as follows: a term of 25 years to life (third strike), plus 10 years (firearm enhancement), plus 3 years (great bodily injury), plus 10 years (two prior serious felony convictions). Sentences for all other offenses were either stayed or to be served concurrently. Defendant Thomson was sentenced to a term of 23 years to

4

life in prison for the attempted murder, calculated as follows: a term of 7 years to life doubled (second strike), plus 3 years (great bodily injury), plus 1 year (principal armed enhancement), plus 5 years (prior serious felony conviction). Defendants filed timely notices of appeal. Defendant Fallon also filed a petition for habeas corpus.

## FACTS

### 1. *The Attack on Donato*

Kathy Rhoten[1] was married to co-defendant Marvin. In June 2012, she was legally separated from him and divorce proceedings were ongoing. Kathy and Marvin had children together. Kathy had obtained an order to show cause on her request for an order modifying child custody, visitation, and support.[2] A hearing was set for June 12, 2012. Marvin received notice of the hearing.

Kathy's current boyfriend was Donato, with whom she also had a young child. Kathy believed the divorce was starting to cause Marvin stress. Kathy had told Donato that, if Marvin called, it would be better if Donato simply did not talk to him.

On June 9, 2012, Kathy's brother hosted a birthday party for one of Kathy and Marvin's daughters. Marvin attended, with defendants Fallon and Thompson. They arrived at the party around 6:00 p.m., and stayed for 30 or 40 minutes.

When the three men left the party, they went to Kathy's house, where Donato was alone. Marvin started banging on the door. Donato told him to go away. Defendant Fallon kicked the door open. When Donato saw the door frame buckle, he ran for the back of the house, with defendant Fallon in pursuit. Donato left the house through the patio door, and began running through the backyard.

---

[1]     We refer to Kathy by her first name for clarity; no disrespect is intended.

[2]     It appears that the prior order was for joint physical and legal custody, with Kathy and Marvin alternating custody weekly. Kathy sought full physical custody, with Marvin having visitation on alternating weekends and a midweek dinner.

Defendant Fallon caught Donato in the backyard. He tackled Donato and began hitting and kicking him. Defendant Fallon tried to hold Donato down and hit him on the head with a pistol repeatedly. While defendant Fallon was beating Donato, he started dragging Donato back toward the covered patio of the house. At some point during his attack, defendant Fallon threatened to kill Donato.

Defendant Thompson then joined in the attack, coming up from behind Donato and putting him in a headlock. With both defendant Fallon and defendant Thompson keeping their grip on Donato, Marvin left the house through the patio door, and ordered Donato to get on his knees. Donato tried to resist. Marvin came over to where defendant Fallon and defendant Thompson held Donato. He opened a "buck knife" and held it to Donato's face, saying, " 'I will fucking kill you.' " The three men continued their attack on Donato, kicking, hitting, and choking him. Donato thought he was going to die.

Donato began pleading, hoping he could somehow convince Marvin to spare his life. He told Marvin that he would leave town, and Marvin could have Kathy back. He offered to " 'work something out with the custody or whatever.' " He also told Marvin that Marvin would never " 'get away with this,' " saying, " 'If I'm dead, you are going to be in prison.' " Donato said that they had family together, and that their children were sisters. He said that, if Marvin killed him, all of their children would suffer. Thereafter, Donato felt the level of violence against him ratchet down. His attackers returned to the house. Donato begged them to leave.

Donato grabbed his mobile phone from inside the house, and called 911. It was approximately 7:00 p.m. As his attackers left the house, Donato said that their kids were siblings. Marvin responded, " 'Well, your kids are gonna die.' "

Deputy sheriffs arrived at the scene after the attackers had left. Donato told the deputies that Marvin was one of his attackers, and described the others, as well as the car in which they had arrived.

As a result of the attack, Donato suffered three fractures to his cheek, a fracture near his eye, a broken nose, and swelling around his neck. Footprints were visible on

6

his head and cheek. After the attack, both of his eyes swelled shut; he was nauseous and dizzy, and in a lot of pain. He will require surgery. He has suffered some memory problems as a result of the attack.

2. *The Confrontation at the Mall*

Less than an hour after their attack on Donato, defendants and Marvin had a confrontation with three individuals in front of the Antelope Valley Mall. Alonzo Payton, Eric Fuggins and Desmond Pendergraph were leaving the mall. As they left the mall, defendants' group made racist comments to them, including use of the "n-word." Payton responded; an argument ensued. Payton and his friends walked away; defendants Fallon and Thompson ran after them.[3] At one point, Payton saw that one of the men chasing him had a knife, and the attackers threatened to kill Payton and his friends. Payton began to run. Mall security had contacted deputy sheriffs, who arrived on the scene and arrested defendants. Defendant Thompson had an open knife in his hand, which he threw away in an attempt to hide it from security.[4]

3. *Post-Arrest Investigation*

Deputy Amy Smith had interviewed Donato at the scene of the attack. When she learned that individuals meeting the description of Donato's attackers had been detained at the Antelope Valley Mall, she went to the mall. The car in which defendants had driven to the Antelope Valley Mall was the same car which had been described by Donato. The car was Marvin's; it was registered to Kathy's mother. A knife was found in the center console of the car. A gun was found under the driver's seat of the car. It was fully loaded with the hammer back.

Donato was brought to the mall. He identified defendant Fallon; the record does not indicate whether he was asked to identify defendant Thompson at that time. The

---

[3]  It is undisputed that Marvin stayed back, out of the confrontation.

[4]  Upon his arrest, defendant Thompson made further racist statements to the arresting deputy. After being placed in the patrol car, defendant Thompson kicked out one of the rear windows of the patrol car. This was the basis for Thompson's vandalism conviction.

next day, Donato identified defendants Fallon and Thompson from photographic arrays. He also identified them in court.

After the defendants were arrested, Deputy Smith took photographs of the soles of the defendants' shoes. The shoes identified as belonging to defendant Thompson[5] appear to match the shoe prints on Donato's face. Donato identified the gun recovered from Marvin's car as the gun used by defendant Fallon during the attack.

4. *Defendant Fallon's Alibi*

Defendant Fallon offered an alibi defense. Defendant Fallon conceded that he was with Marvin and defendant Thompson at Kathy's daughter's party before the assault on Donato; he also conceded that he was with Marvin and defendant Thompson at the Antelope Valley Mall after the assault on Donato. However, he introduced evidence that he was at home during the critical attack on Donato.

Defendant Fallon's defense consisted of evidence that, at 6:45 p.m., a friend picked him up from Marvin's house and drove him to his home. Three people – the friend who drove him home, his girlfriend with whom he was living, and a neighbor – all testified to seeing defendant Fallon at his home that night.[6] No evidence was introduced, however, as to the travel times between Kathy's brother's house (the birthday party), Marvin's house (where defendant Fallon allegedly left the others), defendant Fallon's house (where defendant Fallon allegedly was at the time of the attack on Donato), and Kathy's house (the attack on Donato).

---

[5] Deputy Smith indicated that the shoes had been removed from the defendants by the time she photographed them. She had been told which defendant wore which shoes, and documented the identification in her photographs. There was no hearsay objection to this identification of the shoes.

[6] The neighbor's testimony, in particular, was thoroughly impeached. She testified that she saw defendant Fallon around 7:00 p.m., when she asked him for a cigarette. She also testified, however, that she saw defendant Fallon again later that night, between 10:30 p.m. and midnight. Defendant Fallon, however, had been arrested long before 10:30 p.m.; he did not return home after he left for the mall. The neighbor conceded that she might have been thinking of a different day entirely.

## CONTENTIONS ON APPEAL

On appeal, defendants[7] contend:  (1)  the trial court erred in failing to instruct the jury on the concept of reasonable doubt; (2) the jury was inadvertently exposed to a prejudicial document during deliberations; (3) there was insufficient evidence they intended to kill Donato; (4) there was insufficient evidence they assaulted Payton and Fuggins; (5) there was insufficient evidence Payton and Fuggins were in sustained fear as the result of defendants' threats; (6) there was insufficient evidence that defendant Thompson committed burglary; (7) the trial court failed to instruct on the lesser included offense of brandishing (lesser to assault with a deadly weapon); and (8) the prosecutor committed misconduct in argument to the jury.  In his petition for writ of habeas corpus, defendant Fallon also argues (9) that he was rendered ineffective assistance of counsel due to trial counsel's failure to retain an eyewitness identification expert.

## DISCUSSION

### 1. *Failure to Instruct on Reasonable Doubt*

"It is a fundamental precept of our criminal justice system that before a jury may convict a defendant of a criminal offense, it must find that the prosecution has proved all elements of the offense beyond a reasonable doubt.  State law and the federal Constitution require the trial court to instruct with regard to this fundamental principle when it advises the jurors of the applicable rules of law that govern their deliberation and decision.  In California, a trial court ordinarily satisfies this obligation by instructing the jury under one of two 'pattern' or 'standard' reasonable doubt instructions." (*People v. Aranda* (2012) 55 Cal.4th 342, 349.)  These are CALCRIM No. 220 and CALJIC No. 2.90.  (*Ibid.*)  It is undisputed that the trial court failed to give either instruction in this case.

---

[7]     Each defendant joined in the contentions made by the other defendant, where applicable.

9

The failure to give one of the standard reasonable doubt instructions gives rise to two potential errors.[8] The first error is the failure to instruct the jury that each element of each offense must be proven by the prosecution beyond a reasonable doubt. This is an error under both state and federal law. As an error of federal constitutional dimension, it is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Aranda, supra,* 55 Cal.4th at p. 350.) The second error is the failure of the court to *define* reasonable doubt for the jury. This is not a federal constitutional error; " 'the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.' [Citation.]" (*Id.* at p. 374.) The failure to define reasonable doubt does, however, constitute state law error. (*Ibid.*) It is subject to harmless error analysis under *People v. Watson* (1956) 46 Cal.2d 818.) (*People v. Aranda, supra,* 55 Cal.4th at p. 375.)

        a.       *Failure to Instruct on the Prosecution's Burden*

We first consider the failure to inform the jury that the prosecution has the burden to prove all elements of all offenses beyond a reasonable doubt. We consider this on a count by count basis. (*People v. Aranda, supra,* 55 Cal.4th at p. 358.) That is, a court might instruct that the elements of some offenses must be established beyond a reasonable doubt while failing to give a similar instruction with respect to other offenses. Here, the error affects all of the offenses, but none of the sentence enhancement allegations. The jury was instructed that the prosecution had to prove the following enhancement allegations beyond a reasonable doubt: (1) the attempted murder was premediated (CALJIC No. 8.67); (2) the criminal threats and assaults with

---

**8** These are only *potential* errors. There may not be an error if the substance of the instruction is covered in other instructions given by the court. (*People v. Aranda, supra,* 55 Cal.4th at pp. 354-355, 358.) Indeed, the failure to give a standard reasonable doubt instruction may also give rise to a third potential error: the failure to instruct on the presumption of innocence. However, the requirement to instruct on the presumption of innocence may be satisfied by instructing the jury in the language of CALJIC No. 1.00 that the jury must determine the facts from the evidence received at trial, and not to consider the facts of defendant's arrest or trial. (*Id.* at p. 356.) That instruction was given in this case.

a deadly weapon against Payton and Fuggins were hate crimes (CALCRIM No. 13.54); (3) a person was present at the burglary; (4) a principal was armed during the attempted murder and burglary (CALJIC No. 17.15); (5) the personal use of a firearm in connection with the attempted murder and defendant Fallon's assault with a firearm on Donato (CALJIC No. 17.19); and (6) the infliction of great bodily injury in the attempted murder and the assault with a firearm on Donato (CALJIC No. 17.20). However, while the jury was instructed on the elements of the charged offenses of attempted murder (CALJIC No. 8.66), burglary (CALJIC No. 14.50), assault with a deadly weapon (CALJIC 9.02), assault with a firearm (CALJIC 9.02), and criminal threats (CALJIC 9.94), none of those instructions indicated that the elements must be proven beyond a reasonable doubt. Indeed, in contrast to the instructions which stated that the prosecution had the burden to prove the enhancement allegations beyond a reasonable doubt, each of the instructions on the substantive offenses simply stated that in order to prove the offense, "each of the following elements must be proved."[9] In other words, while the jury was properly instructed on the burden of proof with respect to the enhancement allegations, the jury was not instructed that *the prosecution* had the burden to prove each element of each offense, nor that the prosecution must prove each element of each offense *beyond a reasonable doubt*. This constitutes federal constitutional error with respect to each substantive offense.

We next turn to the issue of prejudice. "Under *Chapman*, a federal constitutional error is harmless when the reviewing court determines 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.] When there is ' "a reasonable possibility" ' that the error might have contributed to the verdict, reversal is required." (*People v. Aranda, supra,* 55 Cal.4th at p. 367.) When the trial court has failed to instruct that the prosecution has the burden of establishing all elements of the offense beyond a reasonable doubt, "the effect of such an error is assessed by asking whether there is a reasonable possibility that the verdict in question

---

[9]      The same was true with respect to the instruction for vandalism.

was not based upon a finding of guilt beyond a reasonable doubt.  If, after examination of the record, the reviewing court concludes beyond a reasonable doubt that the jury must have found the defendant's guilt beyond a reasonable doubt, the error is harmless." (*Ibid.*)  This analysis for prejudice *does not consider* the strength of the prosecution's case.  (*Id*. at p. 368.)  The issue is not whether the defendant would have been convicted in the absence of the error, but whether the record is such that we can conclude that the jury *did* convict the defendant using the beyond the reasonable doubt standard, despite the instructional omission.  Proper considerations in this regard include the court's other instructions to the jury, the jury's verdicts, and, to a lesser degree, the court's remarks to the jury during voir dire.  (*Id*. at p. 371.)

In this case, the strongest evidence that the error was not prejudicial is the fact that other instructions given to the jury mentioned the prosecution's burden to prove the charges beyond a reasonable doubt.  Specifically, the jury was instructed that, in the context of the defendant's right to not testify, a defendant "may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against [him].  No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against [him] on any essential element."  (CALJIC No. 2.61)  The jury was also instructed in the language of CALJIC No. 2.91 that the prosecution has the burden to prove beyond a reasonable doubt "that the defendant is the person who committed the crime with which [he] is charged."  Reasonable doubt was also mentioned in the context of aider and abettor liability (CALJIC No. 3.03), voluntary intoxication affecting mental state (CALJIC No. 4.21.1),  degrees of burglary (CALJIC No. 17.11),  and simple assault as a lesser included offense (CALJIC No. 17.12).

However, closer inspection indicates that beyond a reasonable doubt was not the only standard of proof mentioned in the jury instructions.  CALJIC No. 2.22, governing "weighing conflicting testimony," provides, in part, "You may not decide an issue by the simple process of counting the number of witnesses [who have testified on the opposing sides].  The final test is not in the [relative] number of witnesses, but in the

convincing force of the evidence." In *People v. Nakahara* (2003) 30 Cal.4th 705, 714, the defendant challenged the instruction on the basis that its use of "convincing force" replaces the beyond a reasonable doubt standard with a preponderance of the evidence standard. The Supreme Court rejected the contention, stating that the instruction was unobjectionable "when . . . it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof (see CALJIC No. 2.90)." Here, the trial court gave CALJIC No. 2.22, but did not give CALJIC No. 2.90. As such, the reference to a lesser standard in CALJIC No. 2.22 was problematic. Similarly, CALJIC No. 1.00, in discussing the presumption of innocence, states, "You must not be biased against a defendant because [he] has been arrested for this offense, charged with a crime, or brought to trial. None of these circumstances is evidence of guilt and you must not infer or assume from any or all of them that a defendant is more likely to be guilty than not guilty." The reference to "more likely to be guilty than not guilty" is similarly problematic, in the absence of an instruction expressly indicating the prosecution's beyond a reasonable doubt burden.

In addition, the trial court gave CALJIC 17.31 which provides that "Whether some instructions apply will depend upon what you find to be the facts." In light of this instruction, we cannot presume that the reasonable doubt instruction given in other contexts was necessarily understood by the jurors to apply generally to their determination of the defendants' guilt on all of the substantive offenses.

Other factors which could factor in the prejudice analysis are of little assistance here. The reporter's transcript on appeal does not include the voir dire; there is therefore no indication as to whether the trial court may have discussed reasonable doubt with the jurors before trial.[10] Counsel mentioned reasonable doubt in argument to the jury. Defendant Thompson's counsel, in particular, stated, "Now, what you will

---

[10]    Even if the trial court discussed reasonable doubt with the prospective jurors, "the panel could well have viewed the court's remarks as hypothetical and thus have failed to give the instruction the same focused attention they would have had they been impaneled and sworn." (*People v. Elguera* (1992) 8 Cal.App.4th 1214, 1222.)

13

have to do – and you will get a packet of instructions. What you will have to do is go through the instructions and decide whether the prosecution has proven each element beyond a reasonable doubt. The elements are basically numbered. When you get to the instruction, it will say the prosecution must prove beyond a reasonable doubt, one, and it will give you the element; two, it will give you the elements, and those numbers are called elements and they have to prove each and every one of those beyond a reasonable doubt." While counsel's argument is a correct statement of the law, it is not a correct statement of the instructions given. As noted above, the instructions setting forth the elements of the offenses did not, in fact, "say the prosecution must prove beyond a reasonable doubt" each of the elements. We cannot assume that the jury followed the law as set forth in defendant Thompson's counsel's argument when the jury instructions differed. The jury was instructed that it must accept the law as stated by the court, and if anything stated by the attorneys in argument "conflicts with [the court's] instructions on the law," the jury must follow the court's instructions. Moreover, the jury convicted both defendants of all offenses and found all enhancements true; we can therefore make no inference from the verdict that the jury understood and properly applied the burden of proof.

Considering all of the factors, we cannot say beyond a reasonable doubt that the jury convicted defendants of all counts beyond a reasonable doubt. The jury was not instructed that the prosecution must prove each element of each offense beyond a reasonable doubt. While it is certainly *possible* that the jury inferred the beyond a reasonable doubt standard of proof from other instructions given, it is also possible that the jury concluded a lesser standard applied to the offenses. Reversal is therefore necessary. Moreover, as we shall next discuss, the trial court's failure to define reasonable doubt also contributed to potential jury confusion in this case.

           b.      *Failure to Define Reasonable Doubt*

As discussed above, the failure to define reasonable doubt is a state law error. There is no dispute that the trial court failed to define reasonable doubt in this case; no jury instruction provided the jury with any guidance whatsoever as to meaning of the

14

term.  In determining whether this was reversible error, we consider "whether there is a 'reasonable probability' that a result more favorable to the defendant would have occurred absent the error.  [Citation.]"  (*People v. Aranda, supra,* 55 Cal.4th at p. 354.)

As there were no instructions defining the burden of proof, we focus our harmless error analysis on the arguments made by counsel addressing the issue.  In this regard, we are guided by *People v. Phillips* (1997) 59 Cal.App.4th 952, disapproved on another ground by *People v. Aranda, supra,* 55 Cal.4th at pp. 366-367 & fn. 12.  In that case, both counsel purported to define reasonable doubt during argument to the jury, but they disagreed as to the proper definition.  In the absence of court instruction, the jurors "were bound to be confused as to the exact meaning of the phrase . . . ."  (*People v. Phillips, supra,* 59 Cal.App.4th at p. 958.)

Here, defendant Thompson's counsel was the first to address the meaning of reasonable doubt.  Counsel argued as follows, "Let's discuss a little bit about beyond a reasonable doubt, and it is a very big concept.  But you have been given an instruction about what it means.[11]  It means to have an abiding conviction or a lasting belief of the truth of the charges.  And we have it.  It is the very high standard, and the reason being – it is not a civil court where it's about money.  We are in a criminal court where it's about liberty, and that is why our system is set up and it is a very high standard.  [¶] Basically what it is is, if you have a reasonable question that's left unanswered, that makes you have a doubt about the charges.  Then that is reasonable doubt.  So, again, you have a question.  And, obviously, it has to be reasonable.  But if you have a question that's been left unanswered and you can't answer that question based on the evidence that was presented to you, then that is reasonable doubt and you must come back with a verdict of not guilty.  [¶] Just like you can't consider – the court indicated to you you can't consider punishment and you can't consider whether what's going to happen after this, what's going to happen after my verdict.  What you can consider and

---

[11]     In *People v. Phillips, supra,* 59 Cal.App.4th at p. 958, the court noted that both counsel "told the jurors they would hear the definition of reasonable doubt from the trial judge.  The jurors listened in vain."

15

should consider is whether when you walk out those doors, whether you have the confidence and you know that you did the right thing.  That you have that lasting belief of the truth of the charges.  [¶]  And, again, you have applied this high standard to ensure fairness and justice; to ensure that innocent people don't get convicted of crimes they did not [commit]; to make sure the prosecution proves the charges that they bring upon individuals."

The prosecutor had not addressed reasonable doubt in his initial argument to the jury, but, in rebuttal, responded to defendant Thompson's counsel's argument.  The prosecutor stated, as follows, "The first argument that I have that [defendant Thompson's counsel] brought up is reasonable doubt and what is a reasonable doubt.  So let's really quickly talk about what that concept is.  [¶]  First of all, according to the law, abiding conviction that the charge is true but, more importantly, let's talk about what reasonable doubt is not.  It is not proof beyond all doubt.  It's not proof beyond a shadow of a doubt.  Okay?  So you can have some doubt and still be – it's just beyond a reasonable doubt.  Let's talk about that.  [¶]  The only reasonable explanation is the fact – is the explanation that fits all the facts in the case.  Again, it's a reasonable doubt.  Reasonable being the operative word."

The last few sentences of the prosecutor's discussion of reasonable doubt are somewhat confusing.  The prosecutor stated, "[t]he only reasonable explanation is the fact – is the explanation that fits all the facts in the case.  Again, it's a reasonable doubt."  Was the prosecutor here stating that if the defendant did not offer an "explanation that fits *all the facts in the case*," then the defendant's explanation could be rejected and the defendant convicted?  Was the prosecutor suggesting that if the prosecutor offered "*the* explanation that fits all the facts in the case" then the prosecution had established guilt beyond a reasonable doubt, regardless of the persuasive force of the evidence purporting to establish the prosecutor's view of the facts?  Both statements would be incorrect.  The prosecutor's inartful phrasing of the meaning of reasonable doubt would not constitute prosecutorial misconduct standing

alone.  However, this unfortunate language must be considered in our prejudice analysis.

The trial court failed to define reasonable doubt.  Defendant Thompson's counsel attempted to define the term, but made reference to instructions the trial court did not give.  The prosecutor also attempted to define the term; but, in his discussion, gave a confusing and mistaken explanation of the standard.  We conclude the jury was bound to be confused as to the meaning of the phrase, and that it is therefore reasonably probable that a result more favorable to defendants would have occurred had the jury been properly instructed on reasonable doubt.  It is therefore necessary to reverse on this basis, as well.

2.    *Inadvertent Exposure to a Prejudicial Document*

Donato's medical records were introduced into evidence as Exhibit 29.  This was a multi-page exhibit.  Attached to Exhibit 29 was a one-page e-mail from the prosecutor in this case to one of the detectives in the case.  The e-mail was the last page of the exhibit; the clerk's "admitted in evidence" sticker is attached to the e-mail.  The e-mail addresses three potentially inflammatory topics:  (1) the possibility of a "deal" settling the case against Marvin; (2) Donato hearing threats against him in the neighborhood; and (3) defendants Fallon and Thompson being associated with "Eme," the Mexican Mafia.[12]  (See *People v. Maciel* (2013) 57 Cal.4th 482, 495-496 ("The Mexican Mafia, or EME, was a prison gang").)

---

[12]    The text of the e-mail is as follows:  "Thanks for the pictures, Mark  [¶]  Here is what we need to explore in order to thi[n]k about settling the case against Marvin[] and going against the other two.  [¶]  1) I called Kathy Rhoten re an interview at my office with her and her daughter.  I have to see what my schedule will be since I start trial tomorrow, and will not be [a]ble to finalize the date later this week[.]  Because of her daughter's school, they can only come in after 3:00 p.m.. Are you pretty much free the next couple of weeks?  [¶] 2) We should re-interview Donato about the allegations against him.  Edward Donato says that he has been hearing threats around the neighborhood. [¶] 3) Can we get some good info on Fallon and Thompson's Eme associations? Tattoos, FIs, are all helpful information.  [¶] Please get me the number of Dave Jennings; [¶] 5) If we do decide to do this deal, [I] will prepare a written factual

When "a jury innocently considers evidence it was inadvertently given, there is no [jury] misconduct. The situation is the same as any in which the court erroneously admits evidence. . . . There has been merely 'an error of law . . . such as . . . an incorrect evidentiary ruling.' [Citation.] Such error is reversible only if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. [Citations.]" (*People v. Cooper* (1991) 53 Cal.3d 771, 836; *People v. Rose* (1996) 46 Cal.App.4th 257, 264.)

In this case, the parties stipulated that the jury received the document. However, as the fact that the e-mail was attached to Donato's medical records was not discovered until long after trial, there was no opportunity for the court to withdraw the document from the jury, modify the exhibit, and admonish the jury to disregard the inadvertently-attached e-mail. When the inappropriate exhibit has been discovered in time for the court to " 'have taken corrective steps to cure it through admonition or by other prophylactic measures,' " the danger of prejudice is mitigated. (*People v. Cooper, supra,* 53 Cal.3d at p. 838.) In this case, no such measures were taken.

Moreover, it is apparent that the e-mail inadvertently given to the jurors is highly prejudicial. Any jurors understanding the reference to "Eme associations," would immediately associate defendants Fallon and Thompson with a highly violent gang.[13] The fact that Donato, the victim in the case, was hearing threats in the neighborhood served to underline defendants' gang affiliations and increase sympathy for Donato. Finally, the fact that the prosecutor was considering accepting a plea agreement from Marvin, for which a "factual basis" existed, further confirmed defendants' guilt.

---

basis detailing his plea, which I am going to need you to go over. [¶] All for now. [¶] Thanks, [¶] Ted"

[13] Donato had testified that he described defendant Fallon as Hispanic and would characterize him as a gang member. In argument to the jury, defendant Fallon's counsel argued that defendant Fallon was not Hispanic, but was actually Irish. The e-mail indicating that defendant Fallon was associated with Eme therefore bolstered Donato's identification of defendant Fallon, as it confirmed that he was, in fact, a Hispanic gang member.

18

In addition, we cannot say that the evidence of the charged offenses was so overwhelming that defendants would have been convicted in the absence of this e-mail. As we shall discuss, the evidence that defendants intended to kill Donato, as opposed to intending to beat and frighten him, was limited. More importantly, the evidence that Fuggins was in fear was insufficient to support defendants' conviction for threatening him. The evidence that defendant Thompson committed burglary was similarly insufficient. Nonetheless, the defendants were convicted of these charges.

In short, the e-mail was highly prejudicial, the trial court had no opportunity to attempt to cure any prejudice, and the evidence of several counts of which defendants were convicted was not particularly strong. It is certainly possible that the jury did not believe the prosecution had established defendants' guilt of all charges beyond a reasonable doubt, and simply convicted the defendants as charged because it believed that Marvin pleaded guilty and defendants were members of the Mexican Mafia.[14] We therefore conclude that it is reasonably probable that a result more favorable to the defendants would have been reached in the absence of this error. This is a third reason the judgment of conviction must be reversed.

3.      *Sufficiency of the Evidence Standard of Review*

Although the above errors warrant reversal, "it is necessary to reach defendant's alternative argument pertaining to the sufficiency of the evidence since the absence of sufficient evidence would preclude retrial. [Citations.] When reviewing the evidence for purposes of deciding whether retrial is permissible, we consider all of the evidence presented at trial. [Citation.]" (*People v. Jackson* (2009) 178 Cal.App.4th 590, 600.)

" ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the

---

[14]      This is particularly so when considered in connection with the errors arising from the trial court's failure to instruct the jury that the prosecution was required to establish guilt of the charged offenses beyond a reasonable doubt and to define reasonable doubt.

judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" [Citation.]' " (*People v. Virgo* (2013) 222 Cal.App.4th 788, 797.) " ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" [Citation.]' [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

4.      *There was Sufficient Evidence of Intent to Kill Donato*

Defendants contend there was insufficient evidence to support their attempted murder convictions in that there was insufficient evidence that they actually intended to kill Donato. " ' " 'The mental state required for attempted murder has long differed from that for murder itself. Murder does not require the intent to kill. Implied malice— a conscious disregard for life—suffices. [Citation.]' [Citation.] In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" [Citation.]' [Citation.]" (*People v. Virgo, supra,* 222 Cal.App.4th at p. 797.) The specific intent to kill is the same standard as express malice. "Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]" ' [Citation.]" (*People v. Smith, supra,* 37 Cal.4th at p. 739.)

Evidence of motive is often probative of intent to kill. (*People v. Smith, supra,* 37 Cal.4th at pp. 740-741.) "Evidence of motive aside, it is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.]" (*Id*. at p. 741.) That a defendant may have

20

" ' "abandoned his efforts [to kill] out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance." ' " (*Ibid.*)

A statement of a defendant's intention to kill "has been found sufficient to prove intent to kill in the context of attempted murder." (*People v. Morales* (1992) 5 Cal.App.4th 917, 925-926.) But such a statement can be equivocal if the defendant has only taken acts to *prepare* to kill, and has not committed a direct but ineffectual act toward accomplishing the killing. (*Id*. at p. 926.) Slight acts done in furtherance of the crime will be sufficient; it is not necessary that the defendant take the last possible step prior to actual murder. (*Ibid.*) Obtaining a gun, loading it, driving to the victim's home, and hiding in a position from where the defendant could shoot the victim constitutes sufficient action in furtherance of the crime, even if a shot was never fired. (*Id*. at p. 927.)

Defendants contend there was insufficient evidence they had a specific intent to kill Donato, on the basis that they did not commit a direct but ineffectual act toward accomplishing the killing. Defendants note that, although both a gun and a knife were used in the attack on Donato, Donato was never shot or stabbed. Defendants reason from this that they only intended to beat Donato; had they intended to kill him, they would have used the more lethal means of attack they had at the ready.

Preliminarily, we note that there was *direct* evidence of intent to kill, given that defendant Fallon and Marvin both told Donato that they were going to kill him. Donato testified that defendant Fallon said, "Boom, boom, kill you" and Marvin said, "I will fucking kill you." Marvin also had motive to kill Donato, in that Donato was Marvin's estranged wife's current boyfriend.

Defendants contend, however, that the threats to kill Donato do not necessarily reflect an intent to kill Donato, and that the statements were belied by their conduct which did not include any attempt at a lethal shot or knife wound. We disagree. Defendants certainly could have intended to brutally beat Donato before killing him; indeed, Donato inferred such dual intent from the attack itself. Moreover, all that is necessary to support the conviction is evidence of a direct but ineffectual act toward

21

accomplishing the killing while having the requisite intent; a lethal blow need not be taken. In this case, such a direct but ineffectual act can be found in the fact that defendants ordered Donato to his knees, and attempted to force him to that position. Forcing the victim to kneel is a step toward an execution-style killing. Donato recognized this; he tried desperately to avoid getting on his knees and instead went all the way to the ground. While it is true that Donato ultimately convinced Marvin to let him live, the fact that the defendants attempted to force Donato to his knees when Marvin said, "I will fucking kill you" establishes the requisite union of act and intent.

To the extent defendants argue there was insufficient evidence of premeditation, we disagree. Defendants and Marvin armed themselves with a knife and gun, and drove to Donato's house. When defendant Fallon broke the door down and chased Donato through the house, defendant Thompson went around the side of the house to cut off Donato's escape through the backyard. There followed a coordinated attack by defendant Fallon and defendant Thompson to bring Donato back under the covered patio, where Marvin could kill him.[15] There is overwhelming evidence that the attack on Donato was premeditated.

5. *There was Sufficient Evidence of an Assault on Payton and Fuggins*

Defendants next contend there was insufficient evidence they committed assault with a deadly weapon on Payton and Fuggins. Specifically, they contend that there was no evidence they attempted to strike Payton or Fuggins with a knife, nor that they were ever close enough to do so.

Penal Code section 240 defines an assault as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." The element of present ability is satisfied "when 'a defendant has attained the means and location to strike immediately.' [Citations.] In this context, however, 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict

---

[15] Curiously, Donato never testified that Marvin said, "Bring him back here" or anything else to indicate that the defendants did not know, before they entered the house, exactly how they intended the attack to proceed.

injury on the present occasion. Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*People v. Chance* (2008) 44 Cal.4th 1164, 1168, fn. omitted.) "Although temporal and spatial considerations are relevant to a defendant's 'present ability' under section 240, it is the ability to inflict injury on the present occasion that is determinative, not whether injury will necessarily be the instantaneous result of the defendant's conduct." (*Id*. at p. 1171.)

In the specific context of assault with a knife or similar weapon, it is not necessary for the defendant to actually strike with the knife to be convicted of assault. "To warrant conviction of such offense it was not necessary that the prosecution introduce evidence to show that the appellant *actually made an attempt to strike or use the knife upon the person of the [victim.]*" (*People v. McCoy* (1944) 25 Cal.2d 177, 189.) Nor must the defendant be close enough to strike the victim in order to be guilty of assault. In *People v. Chance, supra,* 44 Cal.4th at p. 1174, our Supreme Court considered a prior case in which "the defendant approached within seven or eight feet of the victim with a raised hatchet, but the victim escaped injury by running to the next room and locking the door. [Defendant] committed assault, even though he never closed the distance between himself and the victim, or swung the hatchet. [Citation.]"

Defendants' argument that there was insufficient evidence that they committed assault on Payton and Fuggins must therefore be rejected. Payton testified that one of the defendants chased after him with a knife.[16] Fuggins testified that it appeared that he and Payton were both defendants' targets. This evidence is sufficient.

---

[16]     In his reply brief on appeal, defendant Thompson argues, for the first time, that Payton did not positively identify defendant Thompson as the man who had a knife or had threatened to kill him. That Payton did not positively identify defendant Thompson as the man with a knife is not a failure of proof. Deputy Wilson arrived on the scene while mall security was following defendant Thompson moments after the assault, and saw defendant Thompson with an open knife in his hand. That Payton did not positively identify defendant Thompson as the man who had threatened him is similarly

23

6.    *There was Sufficient Evidence Payton was in Sustained Fear,*
      *But Insufficient Evidence Fuggins was in Sustained Fear*

Penal Code section 422, subdivision (a) provides, in pertinent part, "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment . . . . "

"The following elements must be proved to show the making of a criminal threat. '(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) *that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety,"* and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances. [Citation.]' " (*In re Sylvester C.* (2006) 137 Cal.App.4th 601, 605.) We are here concerned with the fourth element, whether the victim was in sustained fear.

---

irrelevant. Fuggins testified that both defendants threatened to kill both Payton and Fuggins. Indeed, Fuggins specifically testified that the man who kicked out the window of the patrol car – indisputably defendant Thompson – had threatened him.

24

A victim need not testify that he or she was in sustained fear in order to satisfy this element. Whether the victim was in sustained fear can be inferred from the evidence. (*People v. Ortiz* (2002) 101 Cal.App.4th 410, 417.) Similarly, a percipient witness "could conceivably testify to having observed a person targeted by another's criminal threat actually experienced sustained fear and, in so doing, supply sufficient evidence of the subjective element." (*In re Sylvester C., supra,* 137 Cal.App.4th at p. 606.)

In this case, Payton's testimony as to whether he was afraid is somewhat ambiguous.[17] However, Payton unambiguously testified that, at one point, rather than walk away, he began to run. Later, when asked how long it was before the security guard came over, Payton responded, "Oh, hell, long enough for me to get killed." While it appears that Payton was not particularly frightened when defendants initially directed racist taunts at him, the evidence is that defendants then continued their threats while following Payton with a knife, which made Payton scared enough to run for his life. This is sufficient evidence that Payton was in sustained fear.

Our conclusion is not the same with respect to Fuggins. He did not testify as to whether he was in fear at all. We must therefore determine whether the facts are sufficient to support an inference that he was. Fuggins testified that, as he and Payton

---

[17]     Payton testified that he did not call mall security during the confrontation. This led to the following exchange on cross-examination:

"Q  So evidently you didn't feel it was worth calling security?
"A  How would I call security? I don't have --
"Q: I'm not trying to say anything. I'm asking you, did you feel like you were that threatened?
"A. Yeah. I mean, if I didn't call it, I guess not. How do you call security? Like yell for help?
"Q  I guess."
"A  No. I was just trying to get home. Trying to get home.
"Q  Okay. You were just trying to get home; is that correct?
"A  Yeah. I mean, I didn't think I had to yell for security. Security was watching the whole damn thing."

25

walked away from defendants, Payton said they had a knife and pushed Fuggins a bit back. Fuggins looked, and it appeared to him that both defendants had knives. Fuggins *followed* defendants, in order to make sure Payton remained safe. The inescapable conclusion is that Fuggins was in fear for Payton, but not for himself. We therefore conclude that there was insufficient evidence to support defendants' convictions of criminal threats against Fuggins.

7.      *There was Insufficient Evidence Defendant Thompson Committed Burglary*

Finally, we consider defendant Thompson's contention that there is insufficient evidence that he committed burglary. Penal Code section 459 defines burglary. It itemizes structures and vehicles which can be burglarized, and generally provides that a "building" can be burglarized. In order for a burglary to be committed, there must be a building. A fenced yard is not a building, and, therefore, cannot be burglarized. (*People v. Chavez* (2012) 205 Cal.App.4th 1274, 1280.)

Donato testified unambiguously that when defendant Thompson joined the attack, he came into the backyard from the side gate and not through the house.[18] As such, defendant Thompson did not commit burglary. The prosecution suggests that defendant Thompson aided and abetted defendant Fallon in the burglary, but there is no evidence that defendant Thompson was outside Kathy's front door or provided any assistance to defendant Fallon in the break-in. To be sure, it appears that defendant

---

[18]      The prosecution argues that this testimony may have been disregarded by the jury in favor of Donato's testimony that "he saw that [defendant] Thompson had come into the house with Marvin." The referenced testimony, however, is nowhere near that clear. Donato testified that defendant Fallon followed him through the house. He was then asked, "Now, did you – at some point did you ever see – did anyone else go inside the house?" Donato responded, "Well, not at that moment, no, but the time when other people came into the house, this was after Fallon and I – Mr. Fallon and I were out in the backyard." That Donato saw "other people came into the house" after he and defendant Fallon were in the backyard is *not* testimony that Donato saw defendant Thompson "had come into the house with Marvin." This is particularly true since Donato testified that all three of his attackers went into the house *after* the attack (when there was no evidence of criminal intent).

26

Thompson ran around the back of the house to prevent Donato from escaping, but this aided and abetted the assault and attempted murder, not the criminal entry into the house. (See Pen. Code, § 459.)

8. *Conclusion*

The convictions must be reversed due to the failure to instruct on reasonable doubt and the inadvertent disclosure of a highly prejudicial e-mail to the jury. In addition, there is insufficient evidence that defendants are guilty of criminal threats against Fuggins and that defendant Thompson is guilty of burglary. Those counts, therefore, cannot be retried.

As we reverse, there is no need to consider defendants' other contentions regarding jury instructions and prosecutorial misconduct. Defendant Fallon's habeas petition for ineffective assistance of counsel is likewise moot.

27

### *DISPOSITION*

The judgments of conviction are reversed. Defendant Fallon's petition for habeas corpus is denied as moot. The case is remanded to the trial court for further proceedings consistent with this opinion.

### *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

LAVIN, J.[*]

WE CONCUR:

KITCHING, Acting P. J.

ALDRICH, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.